`

**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE**

| | | |
|---|---|---|
| **BAPTIST PHYSICIAN HOSPITAL ORGANIZATION, INC. and BAPTIST HOSPITAL OF EAST TENNESSEE, INC.,** | ) ) ) | |
| **Plaintiffs,** | ) | |
| | ) | **3:01-cv-588** |
| **v.** | ) | |
| | ) | **(Phillips)** |
| **HUMANA MILITARY HEALTHCARE SERVICES, INC.,** | ) ) | |

<u>**MEMORANDUM OPINION**</u>

This case came before the undersigned on August 31, 2005, for trial without a

jury.

<u>**NATURE OF CASE**</u>

This is an action for breach of a network provider contract between plaintiffs,

Baptist Physician Hospital Organization, Inc. (PHO) and Baptist Hospital of East

Tennessee, Inc. (BHET) (collectively "Baptist") and defendant, Humana Military

Healthcare Services, Inc. (Humana). The contract at issue pertained to providing

medical services under the Civilian Health and Medical Program of the Uniformed

Services (CHAMPUS). Plaintiffs claim that they are entitled to recover contractual

damages from Humana in an amount equal to the discounted charges for medical

services they rendered to CHAMPUS beneficiaries, less amounts they were actually

paid for those services. Humana has asserted a counterclaim for alleged overpayments

it made pursuant to the contract.

On appeal, the Sixth Circuit agreed with this court that the Letter of Agreement at issue in this case incorporated "federal regulations and associated TRICARE policies." However, the Sixth Circuit further held "that the federal regulations incorporated by reference into the agreement between Baptist and Humana regulate only the amount the government can contract to pay Humana and not the amount Humana as an independent contractor can promise to pay Baptist." *Baptist Physician Hospital Organization, Inc. v. Humana Military Healthcare Services, Inc.*, 368 F.3d 894, 895 (6th Cir. 2004); see also *Bay Med. Ctr v. Humana Military Health Care Servs.,* No.5:03-cv-144/MCR 2004 WL 3314946 (N.D. Fla. March 16,2004). In its opinion, the Sixth Circuit rejected Humana's reliance on "a lengthy recitation of parol evidence relating to the parties' disputed 'understandings' during negotiations," *id.* at 899, finding that "we need not look beyond the four corners of the agreement to determine that, by its terms, the parties agreed that Humana would pay certain high-dollar claims as a percentage discount off provider charges, and that federal law and regulations do not prohibit such payments so long as the payments are not made with government 'health care dollars.'" *Id.* at 900. Thus, the Agreement required Humana to pay sums in excess of government allowables on certain claims. The Sixth Circuit further stated that it need not reach Humana's argument that in the event the stop loss is found not to be subject to a regulatory cap, then this court's previous grant of summary judgment should be affirmed on the grounds of waiver, because that issue was pretermitted below by this court's decision. *Id.* at 901.

Baptist argues that pursuant to the Sixth Circuit's opinion, the only issue

remaining in defense of the breach of contract claim is whether plaintiffs waived their right to pursue and recover the monies owed to them pursuant to the stop loss.

Humana raises additional issues:

> 1.  Whether the contract between the parties was modified with respect to high-dollar claims so that those claims would be paid in accordance with the TRICARE/CHAMPUS DRG-based payment system as opposed to the alternative reimbursement system called for in the parties' original Agreement?

> 2.  To what extent is Humana entitled to recover on its counterclaim?  In the alternative, if Baptist is entitled to any recovery, to what extent is Humana entitled to a setoff due to the counterclaim?

> 3.  If Baptist is entitled to recover any amounts, are they entitled to prejudgment interest?

Humana contends the proof at trial established that Baptist agreed to accept the TRICARE/CHAMPUS DRG-based payment on each of the claims at issue.[1] Furthermore, by accepting payments, and through their conduct, Humana argues Baptist waived their right to make a claim for payment, or are otherwise precluded from making such claims.  Humana asserts Baptist waived their claims for breach of contract after, at the very least, having specific knowledge of Humana's interpretation of and breach of the Agreement in the middle of 1999.  To the extent that plaintiffs are entitled to any recovery, Humana asserts that the claim, including the amount, was disputed until the very day of the trial, and that prejudgment interest for Baptist would not be appropriate.

---

[1]The acronym "DRG" refers to "Diagnostic Related Groupings."  The DRG lists diagnoses for which a fixed fee is set by the federal government for inpatient care. CHAMPUS or government allowables refer to a federally set fee rate for service which incorporates a DRG rate, modified by various weighting factors.

## STIPULATED FACTS

It was agreed by the parties that the 85 inpatient claims at issue resulted in an underpayment to Baptist in the amount of $1,277,872.90.  It was also agreed that the amount of outpatient overpayment by Humana totaled $237,924.89.

## THE LAW OF THE CASE

According to the conclusions of the Sixth Circuit, the August 1996 contract between the parties created an alternative reimbursement system to the TRICARE/CHAMPUS DRG-based system.  Under this alternative reimbursement system, for certain high-dollar claims, Humana agreed to pay plaintiffs a discount off of Baptist's provider charges (the stop loss provisions).  In reaching its opinion, the Sixth Circuit agreed with this court that "federal regulations and associated TRICARE policies [were] incorporated into the parties' agreement by reference...," but disagreed with this court's finding that federal law and regulations categorically prohibit an alternative reimbursement payment system.  The Sixth Circuit opined that such alternative payment systems were permissible so long as they are not paid with the federal government's "health care dollars."

The appellate court determined that plaintiffs discovered in 1998 that Humana was not paying Baptist's claims according to the alternative payment/stop loss terms. Baptist demanded payment of the difference, but Humana refused to honor the contract provision, insisting instead on renegotiating the contract.  Attempts to renegotiate,

4

however, were unsuccessful, and Baptist filed suit on December 7, 2001.

## REVIEW OF APPLICABLE AUTHORITIES

As noted by the Sixth Circuit, "[u]nder Tennessee law, in reviewing a contract for ambiguities, the court considers the contract as a whole, *Williamson County Broad. Co. v. Intermedia Partners*, 987 S.W.2d 550, 552 (Tenn. Ct. App. 1998); *Gredig v. Tennessee Farmers Mut. Ins. Co.*, 891 S.W.2d 909, 912 (Tenn. Ct. App. 1994)."

The Court further indicated:

> "A contract is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one. A strained construction may not be placed on the language used to find ambiguity where none exists." *Farmers-Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn. 1975). However, "[a] contract is not rendered ambiguous simply because the parties disagree as to the interpretation of one or more of its provisions." *International Flight Ctr. v. City of Murfreesboro*, 45 S.W.3d 565, 570 n. 5 (Tenn. Ct. App. 2000). Interpretation of an unambiguous contract is a question of law for the court to decide. *Hamblen County v. City of Morristown*, 656 S.W.2d 331, 335-36 (Tenn. 1983). "Where a contract is clear and unambiguous, parties' intentions are to be determined from the four corners of the contract." *Bokor v. Holder*, 722 S.W.2d 676, 679 (Tenn. Ct. App. 1986). Even when the agreement is unambiguous, however, the court may "'consider the situation of the parties and the accompanying circumstances at the time it was entered into - not for the purpose of modifying or enlarging or curtailing its terms, but to aid in determining'" the contract's meaning. *Hamblen*, 656 S.W.2d at 334 (internal quotation marks omitted)."

## REVIEW OF EVIDENCE PRESENTED AT TRIAL

The first witness called by plaintiffs was Doris Thompson (Thompson), who currently is employed by Baptist as the Controller. She has received Associate's Degrees from Hiwassee College and Roane State Community College, along with a

5

Bachelor of Science Degree in Business Management with an Accounting emphasis from Tennessee Wesleyan College. She has been employed by Baptist for approximately 28 years.

Thompson initially started working for Baptist at its Rockwood facility in an entry-level position in 1973. Between 1973 and 1988, she performed all the business functions at that hospital. In 1988, Thompson was named Controller at the Rockwood facility. In 2000, she became a Financial Analyst at BHET in Knoxville. In that position, she analyzed managed care contracts and developed models in order to determine the outcome of contract rates and terms. She also performed analysis on any new or existing service that needed review.

As to the stop loss issue, Thompson indicated Greg Brown (Brown), the Director of Payor Relations, initiated discussions with her regarding whether Baptist was being paid according to the terms of the contract. Brown asked her to do some analysis regarding the Humana contract. In August or September of 2000, Thompson started looking at the real outcomes under the Humana contract. She used software licensed by Baptist to do analysis by any criteria on any type of patient account. The witness testified that the information is fed from the patient accounting system and downloaded each month. As to the Humana contract, Thompson ran reports out of the system as to any claim tied to the Humana code to determine if any of those claims actually met the stop loss threshold. According to Thompson, she discovered that about 85 patient accounts hit the threshold and that Baptist had not been paid properly according to the

6

terms of the contract.

On cross-examination, Thompson testified she did not know how long Baptist had been utilizing the software program, but that she has used the system since her return to Baptist in March 2000. The witness stated she could run reports at any time that showed which claims actually met the stop loss. Thompson noted that when a patient enters the hospital, a unique patient ID code or number is assigned to the individual. Plaintiffs use the code as an identifier for the billing process and can tie the number to other records in Baptist's system.

Thompson noted that "Billed Charges" information can be tied to the UB-92 forms used to submit claims to Humana. "Expected reimbursement" denotes the amount she calculated due Baptist based on the terms of the contract. "Baptist Posting and Receipt of" reflects the date that payment was received from Humana. She indicated that the first date Baptist received a posted payment on any of the stop loss claims was February 21, 1997.

Thompson testified that payor codes are also assigned to patients. In the case of TRICARE, the patient presents an ID card that verifies the individual's right to participate in the program. When the patient is discharged, plaintiffs do not collect any sums from the patient at that time. Instead, plaintiffs properly document the patient's account before proceeding with the billing process. The witness noted that the deductibles, cost shares and co-pays were billed to the patient after Baptist received

7

payment from Humana.

As to the UB-92 forms, Thompson indicated that the bottom of the claim form reads, "I certify the certifications on the reverse apply to this bill and are made a part thereof." On the back of the form, under (h), the second sentence states, "I agree to accept the CHAMPUS-determined reasonable charge as the total charge for the medical services or supplies listed on the claim form." Further noted is that the provider "will accept the CHAMPUS-determined reasonable charge even if it is less than the billed amount, and also agree to accept the amount paid by CHAMPUS, combined with the cost-share amount and deductible amount, if any, paid by the patient...." Thompson claimed, however, that such language did not apply to the stop loss claims, because the contract at issue was with Humana and not CHAMPUS.

The witness testified that under a DRG-based payment system, a lump sum payment is determined by the diagnosis the patient receives, with the correct weight and base rate applied. As to the stop loss claims at issue here, Thompson indicated these were not subject to the DRG-based payment system, because Baptist had a contract with Humana that specified the individual stop loss claims were to be paid by an alternative method. The witness noted that she had not actually submitted the claims, so she could not address whether the claims were submitted pursuant to CHAMPUS policies and procedures.

In response to questioning regarding Exhibit 52, a patient claim, Thompson

8

stated that the billing clerk who signed and submitted the form would not have known the claim was subject to the stop loss, as billing clerks are not cognizant of the details of the contracts. Thompson noted the Humana claims were submitted to Palmetto Government Benefit Administration (PGBA) for processing and payment on behalf of Humana. Baptist would initially receive a summary payment voucher. After payment was received, it was posted to the patient's account and the individual was then billed for his/her portion of the outstanding amount. The witness asserted that the clerical staff at Baptist who processed the payments received from Humana did not have any knowledge of what amount Baptist expected to receive from Humana.

The witness was questioned as to an April 22, 2005, letter from Humana to Thompson, which read: "We have processed your request for capital and direct medical education reimbursement under the TRICARE/CHAMPUS DRG-based payment system." Thompson stated capital reimbursement is a separate issue from the stop loss matter, having to do with the number of days and services Baptist provided to the CHAMPUS patient, along with the amount of capital expenditures Baptist had per fiscal year. The witness testified that capital reimbursements reflect a portion of capital expenditures Humana reimbursed to plaintiffs. The stop loss claims were to be paid in an alternative manner than the DRG-based payment system.

Thompson stated she did not speak with a Humana representative until approximately June of 2001, when Brown asked her to speak with Robert (Rocky) Lubbers (Lubbers) regarding the stop loss issue. Thompson noted that when she found

9

the discrepancies in the stop loss payments went all the way back to 1996, she had no opinion as to whether Baptist had properly monitored the payments closely enough, as she did not work at Baptist at that time. Thompson acknowledged, however, that in a deposition, she had expressed the opinion that Baptist probably "didn't monitor payments closely like we should, ..." The witness testified that she did not investigate to see if the non-payment issue had been raised previously.

Thompson indicated that no payment for capital reimbursement was received by Baptist for the period 2000-2001 because Humana claimed the form for the fiscal year ending 6-30-01 was not submitted timely. She testified the Humana contract was formally terminated effective May 2001. The last patient admission date was April 30, 2001.

On redirect, Thompson emphasized that Baptist's contract was with Humana, not CHAMPUS. She noted the patient's portion of the bill was calculated by Humana when it determined the amount it would pay Baptist. The witness contended that Baptist relied upon the calculations received from Humana, since plaintiffs did not have the formula to calculate the patient's portion.

Thompson stated the UB-92 claim form was developed as a universal billing form for use by all hospitals and Baptist used the UB-92 to bill all payors. She noted that if the language on the back of the UB-92 form was applicable to all the claims that were submitted during the life of this contract, Baptist would have been paid the full DRG

10

reimbursement. However, under the contract, for the non-stop loss claims, Baptist accepted as payment a discount off the DRG calculation. If the stop loss provision came into play, Baptist was to be paid pursuant to an alternative method as per the Agreement.

On re-cross, Thompson noted that in regard to the deductibles, Baptist billed a patient based upon what the summary voucher or the payment that came from Humana determined the patient cost to be. Thompson testified that the patient's cost share would be limited to the DRG rate. She agreed that if Baptist had been overpaid in error by Humana, plaintiffs may have over-billed these patients based on improperly calculated patient cost shares.

Defendant's first witness was Richard Mancini (Mancini), who has been employed by Humana for 23 years. A graduate of Indiana State University, Mancini is a registered dietitian by profession. He coordinated Humana's original TRICARE proposal for Regions Three and Four and has been Director of Network Development with Humana since the contract went live in 1996.

Mancini testified that the DRG-based payment system is advanced by the Federal Register and is applicable to hospitals that accept Medicare. According to Mancini, when a hospital sees an inpatient and submits a claim to the TRICARE fiscal intermediary, based on the discharge diagnosis, that claim is grouped to a DRG classification. A non-network hospital or a hospital that by condition of its Medicare

11

license has to accept a DRG payment gets paid somewhere around 50 cents on the dollar.

Mancini stated he became involved with Baptist during the transition to the TRICARE system in early 1996. Before the Letter of Agreement, there was an Interim Agreement, signed by Mancini on behalf of Humana on April 1, 1996. Once Humana learned that Baptist had a PHO, Mancini desired to sign a contract incorporating the physician component along with the hospital system. Mancini asserted the Letter of Agreement signed in August 1996 was a Successor Agreement, taking the place of the Interim Agreement. The contract changes added the physicians at a discount off the lesser of Medicare or CHAMPUS maximum allowable charges (CMAC).

Mancini recalled that prior to the execution of the Letter of Agreement, he engaged in a conference call with Pete Petruzzi (Petruzzi), Humana's contractor on the ground in Tennessee. They discussed the Baptist negotiations, how the physicians would be paid and how Humana wanted to pay under the TRICARE program. He also had discussions with James (Jim) Goodloe[2] (Goodloe) of Baptist concerning how Humana would pay the physicians. Mancini claimed he cautioned Goodloe that if a physician expects $100 under this contract and the government allowable is $80, then Humana was not going to pay any more than $80 on that claim.

---

[2]Then Vice-President of Managed Care and Executive Director of Baptist Physician Hospital Organization.

Mancini discussed the letter that he had authored and used to send the signed contract back to Goodloe. He noted that the original contract in April and the Successor Agreement in August called for a renegotiation of the hospital terms in September 1996. The letter read, "Jim, as we move toward the next round of negotiations, specifically, inpatient *per diem* rates ...." Mancini noted that "inpatient *per diem* rates" meant Humana wanted to have participation agreements with hospitals that were at *per diems*, daily rates that were all-encompassing. The letter also indicated, "I want to make sure we both understand that your claims will be paid according to a discount from government allowables." The letter further related, "I know there has been some question that you wanted to be paid more than the government provides, but we aren't allowed to pay your facilities any greater than the non-network rate." Mancini claimed the letter is of the type that he would normally write to providers and was in his capacity as a Network Development Director. He testified that Humana was trying to negotiate on behalf of the federal government some pricing advantage in return for steerage of patients. He considered the concept of disregarding the DRG to be inconsistent with what he had discussed with Goodloe and told Goodloe that the parties would need to come up with a *per diem* rate that would calculate out to be no higher than the government allowable under the DRG system. Mancini claimed the government tells Humana to pay no more than the government allowable or DRG.

Mancini testified that he received a call from Gayle Van Veen[3] (Van Veen) in late

_____

[3]Director of Area Field Operations for Humana.

13

2000 concerning the claims issue with Baptist. In conference calls, he discussed strategy and reiterated policy with her. The two, with the assistance of Brent Milam (Milam), the Network Development Manager, also planned a renegotiation strategy. Mancini noted that between 1996 and the call from Van Veen, no one at Baptist informed him that they disagreed with Humana's interpretation of the contract. He claimed that if someone had so indicated, he would have gathered his team and set up a meeting with Baptist to discuss the situation. According to Mancini, if Humana had felt that an impasse was imminent, it would have terminated the contract. He asserted that in 1996, Humana had an adequate network in the area, as the St. Mary's Hospital contract was still in place. However, he admitted that by the time Humana memorialized the Successor Agreement in August 1996, it had already terminated St. Mary's to make the Agreement with Baptist exclusive in order to improve the financial discounts available to Humana, the beneficiaries, and the federal government. Yet he claimed Humana did not need to have a network hospital in Knoxville at that time, since as a condition of Baptist's license with Medicare, plaintiffs have to see TRICARE beneficiaries anyway. According to the witness, even in the absence of having another agreement in place, he still had facilities available in Knoxville for use by CHAMPUS patients. Mancini claimed, therefore, that no conflict with the government would have resulted from canceling the contract. Thus, Mancini contended that if Baptist had insisted in 1996 on being paid the stop loss, Humana would have terminated the Baptist contract then.

Mancini testified that plaintiffs were notified of their termination as network

14

providers in February or late January of 2001, effective in mid-May of 2001, because Baptist would not accept the limitations on Humana's ability to pay. The witness claimed Humana could not fulfill the expectations of Baptist under the contract, since plaintiffs insisted on being paid the full stop loss.

On cross, Mancini stressed there was a provision in the Letter of Agreement where the parties intended to go to a *per diem* arrangement after the Agreement was signed, but the next round of negotiations never occurred. Shortly after the Agreement was signed, Humana decided not to pursue the *per diem* arrangement, apparently because it realized it would have to clarify to the providers that they would not be paid more than government allowables. According to Mancini, the terms of the hospital payment arrangement were never modified and remained in place until the contract was terminated. He noted the signed amendments in 1998 and 1999 did not affect the stop loss provisions. The witness contended that he was confused when he stated in his deposition that at the time he signed the Letter of Agreement, he knew Humana did not intend to pay Baptist the full percentage off the billed charges as to the stop loss claims.

Mancini admitted Humana did not terminate the Agreement with plaintiffs because of any factual misrepresentation of any kind by Baptist. The witness noted that he has no knowledge that anyone from Baptist ever told Humana that plaintiffs were not going to insist on being paid in full as to the stop loss. Mancini also admitted he never discussed the stop loss with Goodloe, even though it was contained in the Interim

15

Agreement and Successor Agreement. According to Mancini, Humana's notice to Baptist that it was terminating the contract was after Baptist wrote defendant to advise Humana that plaintiffs would take legal recourse if the stop loss claims were not paid.

On redirect, Mancini stated that when he executed the Letter of Agreement, he did not realize the stop loss would calculate above the DRG payment. As to his conversations with Goodloe, Mancini asserted Baptist advanced the notion that Humana should rebate back to plaintiffs a portion of the negotiated discount in return for bringing the physicians into the network. Mancini stated he explained to Goodloe that he was not going to rebate back the negotiated discount, as it favored the beneficiaries and saved the federal government money. The witness claimed he was pretty upset with the whole notion that plaintiffs wanted to shake him down for a portion of the discount in return for bringing the doctors to the table, because if plaintiffs wanted to enjoy the benefit of the TRICARE program and wanted more business, the physicians needed to be in the network.

Mancini further testified that it became clear to him that Goodloe and his team did not understand there was a ceiling of reimbursement. When Humana went forward with the new negotiations, Mancini wanted to make sure the ceiling would be recognized in a *per diem* type system. According to Mancini, Humana was going to look at the claims in the system for the two-month period, come up with a *per diem* rate that would be equivalent to the DRG payment, and then negotiate something for the future. It was his understanding that all the claims would be capped by the government allowable.

16

On re-cross, Mancini was questioned regarding his deposition of April 23, 2002. In that deposition, when he was questioned, "[a]t the time that you signed the agreement, did you know Humana would not pay Baptist according to the stop loss terms?," he answered, "When I signed the April 1, 1996, agreement, I did not know that. When we got to the August 6th – or August 8th - whatever date I signed the agreement, I had a pretty good understanding that we were going to have a problem with that."

The court noted that in his testimony, Mancini had stated that if he had known the stop loss provisions were enforceable, he would have terminated the contract. Upon inquiry by the court as to why Mancini had signed the contract containing the stop loss terms, the witness testified that when he signed the Agreement, he was not thinking about the hospital terms, because he knew he had an upcoming negotiation to readdress them. Mancini further stated that at that time, he did not have the benefit of a claims history to see how the claims were going to pay, since Humana had only been operating the TRICARE program for 45 days.

The next witness for defendant was Anahita Hodge (Hodge), who is currently employed with Peninsula Behavioral Health as Director of Operations. She has been with Peninsula for five years. Previously, beginning in 1997, she had been employed by Baptist as a Contract Analyst. In that position, she analyzed plaintiffs' managed care contracts to determine if underpayments existed. When she discovered an underpayment, she reported it to Greg Broyles (Broyles), the Director of Managed Care, and the Business Office. She then sought payment. Hodge testified that when she first

17

started at Baptist, they did not have a process to pursue underpayments and that she helped in developing one. According to the witness, a software program, Pathways Contract Management System (PCMS), was utilized by Baptist to determine the underpayments on the managed care contracts. Hodge noted that implementation of the program took a while, as Baptist had to load then test the contracts on the system. Baptist then had to monitor the system to make sure it was working correctly. Hodge indicated that she had to coordinate that process with the IT department. She noted that all of the contracts could not be loaded at the same time, and that when she left Baptist, contracts still needed to be loaded on the system.

Hodge testified that a monthly management packet allowed the departments and management to communicate on a regular basis. According to Hodge, she never had any problems with reports generated by PCMS. When she first started working with the system, only approximately five contracts were loaded. Hodge claimed she made sure those five were loaded correctly before she added any additional contracts on the system. According to the witness, as of February 19, 1998, she was able to produce reports that detailed the expected reimbursement versus the actual payments received as to the Humana contract.

Hodge testified that she put the Humana contract into live production on PCMS in November 1998. At that time, Hodge believed Humana was not paying the stop loss correctly based on the information available to her.

18

Hodge testified that during her time at Baptist, she prepared the managed care reports, the purpose of which was to communicate information as to the managed care department on a monthly basis. She noted the November 18, 1998, report ranked all of the contracts by gross charges and net deductions. According to Hodge, by total, the graphs in the report allowed Baptist to track what was paid and what was deducted from the payment received. As to the December 17, 1998, report, Hodge indicated that she could track by discount how claims had been paid for the period in question. The variance report at that time showed an underpayment of $10,000 for the period. On the January 1999, report, the variance report reflected a total underpayment of $32,000. On March 12, 1999, Baptist produced a report that set out both the total amount of overpayments received on outpatient claims and the total underpayment on inpatient claims for the life of the parties' contract. Based upon the report, Hodge testified that as of March 12, 1999, underpayments from Humana on the inpatient claims totaled $63,560, and overpayments on the outpatient claims totaled $82,322, representing a net $18,762 in overpayments from Humana. However, Hodge testified that it was not her job to pursue overpayments. On the April 22, 1999, report, Hodge included a section regarding CHAMPUS which stated, "50 accounts that hit the stop loss are not paid correctly. This has been filed with CHAMPUS for reprocessing." Hodge testified that at this time, Baptist was aware the claims were not being paid in accordance with the stop loss. By the April 28, 1999, report, the stop loss underpayment totaled $411,000.

The witness testified that on July 22, 1999, she wrote a letter to the PGBA

requesting that the claims through that date be paid according to the stop loss provisions of the Agreement. After discussions with representatives of defendant, her understanding of Humana's position on the payment of the stop loss claims was that Humana refused to pay them. Hodge relayed the information to her superiors for a decision. She asserted no one directed her to pursue payment any further, so she did not otherwise get back with Humana on the issue. According to the witness, neither Humana nor the PGBA paid the claims for the stop loss claims while Hodge was at Baptist. As to the October 1999 report, Hodge acknowledged there is no mention of the stop loss underpayment and no mention of CHAMPUS. This status continued with the reports that followed. The January 17, 2000, report was Hodge's last managed care report.

On cross, Hodge testified that when she started with Baptist in 1997, she had never worked with health care contracts before. She noted that Baptist was actually in the forefront as a user of PCMS. As to her conversation with Carmen Montanez (Montanez) of Humana, she claimed to have never told Montanez or anyone at Humana that Baptist conceded the stop loss issue or agreed with Humana's decision.

The next witness for Humana was Goodloe, currently employed with the Tennessee Hospital Association in Nashville. In 1996, he had been employed by Baptist and entered into the Humana contract on behalf of plaintiffs. Upon questioning as to his April 24, 2002, deposition, in which he stated, "we were bringing that software up during this time frame, so we really didn't have the ability to monitor the correctness

20

of that, of what we were being paid not just this contract, but for any contract," Goodloe

testified that from the prospective of hospitals, they need to verify what the correct

payments should be, but that it is a very difficult thing for hospitals to accomplish. On

cross, Goodloe noted that it was incumbent upon Humana to pay the contract in

accordance with the terms of the Agreement.

Defendant's next witness was Montanez, who has been employed by Humana

for thirteen years. She indicated her awareness of the stop loss issue began when she

received a call from Hodge in the Summer of 1999. At that time, she directed Hodge to

the TRICARE website for the policies and procedures and believed she faxed some

additional information to her. Montanez testified that she explained to Hodge that due

to the policies and procedures, the stop loss under the Agreement would not be

calculated. After a lengthy conversation ending with Montanez telling Hodge to call

back if she had further questions, the witness never spoke to Hodge again. The

following year, Montanez received a brief call from someone else at Baptist regarding

the same issue and she advised him the same way she had Hodge. She changed job

locations shortly thereafter.

On cross, Montanez admitted that she does not recall Hodge or Baptist agreeing

with Humana's position. She noted the 2000 caller did not concede the issue either.

On redirect, Montanez indicated that she actually walked Hodge through the

calculations of how the claims would be paid per the policies and procedures of

Humana. On re-cross, Montanez was directed to her deposition in which she had

21

testified that, in her opinion, Hodge did not understand the policies and procedures.

The next witness for defendant was Lubbers, a Humana employee for the past 11 years. He is Director of Special Studies and Self-Inspection, actually running two departments - one called Self-Inspection, an internal audit, and one called Integrity, a fraud and abuse department. Lubbers testified that he had reviewed the 85 inpatient claims at issue. He had no involvement with respect to contracting with Baptist, but loaded the contract into the Provider Information Management System. Thus, he interpreted what the Agreement stated and loaded it in an acceptable format in order that the claims would be paid appropriately. Lubbers asserted that he indeed loaded the stop loss provision into the system. However, according to the witness, the stop loss was limited by the overall DRG. Thus, if 65% of the billed charges exceeded 100% of the DRG allowable, Humana paid the DRG allowable.

Upon Lubbers' review of the claims and payments, he prepared a graph demonstrating that if the contract had been terminated as of March 1, 1997, a net overpayment by Humana would have resulted. If the contract had been terminated as of March 1, 1998, a net overpayment by Humana of $39,882.48 would have resulted. If the contract had been terminated as of March 1, 2001, a net underpayment of $920,360.30 would have resulted.

On cross, Lubbers noted that the outpatient overpayment was recognized by Humana in the Spring/Summer of 2001, while addressing the contract issues. It

22

appears that because of confusion regarding the exclusivity provisions of the contract, Humana overpaid Baptist. The witness indicated that if Humana overpaid the claims, the patient cost shares were also overpaid and money might be due back to the patients as well. Lubbers testified that as a government contractor, Humana has a responsibility to recover any money it has overpaid.

On re-cross, Lubbers explained that all of the counterclaim dollars would not be owed directly to Humana. Further, he admitted that the capital payments were not actually specified in the payment portion of the Agreement and were not made at the same time as regular patient payments but annually.

**<u>FINDINGS OF FACT</u>**

1.  On August 6, 1996, Humana's Director of Network Development, Mancini, executed the Letter of Agreement after having received the signed Agreement from Goodloe, Baptist's Vice President of Managed Care [Tr. at 12, 86].  Pursuant to the Agreement, Humana agreed to pay Baptist in accordance with the "Hospital Payment Arrangement" attached as Exhibit A to the Agreement [Tr. Ex. 1].  Pursuant to the Agreement, inpatient services were to be reimbursed based primarily on a percentage discount off the CHAMPUS DRG reimbursement rate; however, high-dollar inpatient claims exceeding certain agreed thresholds were to be paid pursuant to a "stop loss" provision calling for an increased rate of payment based on a discount from Baptist's normal gross charges instead of the percentage discount from the DRG rates [Tr. at 75-76, Ex. 1].  The payment terms were expressed in the Hospital Payment Arrangement exhibit to the Agreement as follows:

**Baptist Health System as Exclusive Provider**

<u>Inpatient</u>
20% Discount from CHAMPUS DRG rates;

*Any case with provider charges greater than $30,000 reverting to 45% discount from provider charges.*

<u>Outpatient</u>
30% Discount from CHAMPUS allowables.

**Baptist Health System + 1 Additional Provider**

<u>Inpatient</u>
20% Discount from CHAMPUS DRG rates;

24

*Any case with provider charges greater than $25,000 reverting to 35% discount from provider charges.*

<u>Outpatient</u>
25% Discount from CHAMPUS allowables.


**Baptist Health System + 2 Additional Providers**

<u>Inpatient</u>
15% Discount from CHAMPUS.DRG rates;

*Any case with provider charges greater than $25,000 reverting to 30% discount from provider charges.*

<u>Outpatient</u>
25% Discount from CHAMPUS allowables.

[Tr. Ex. 1].  (Stop loss provisions in italics).


2.  On August 8, 1996, Mancini wrote a cover letter to Goodloe that read as follows:  "Jim, as we move toward the next round of negotiations, specifically:  Inpatient per diem rates, I want to make sure we both understand that your claims will be paid according to a discount from Government allowables.  I know there has been some question that you wanted to be paid more than the Government provides, but we aren't allowed to pay your facilities any greater than the non-network rate.  Accordingly, the per diem rates that we agree upon will need to be comparable as provided for in paragraph M of our contract."  [Tr. Ex. 8, Tr. at 71-75] Mancini wrote the letter to set the tone for the "next round" of negotiations referenced in the Agreement and to "send a message" [Tr. at 72] .


3.  Baptist and Humana had earlier executed an Interim Agreement in April 1996,

containing the exact Hospital Payment Arrangement terms that were included in the August Agreement [Tr. at 67]. Between the time of the execution of the Interim Agreement and the execution of the Agreement at issue, Mancini had only one conversation with Goodloe [Tr. at 69, 85-86], concerning negotiation of the physician payment terms to be included in the Successor Agreement [Tr. at 69-71, 86, 98-99]. The Hospital Payment Assessment terms that included the stop loss were not discussed in the period of time between April and August 1996 [Tr. at 99]. When Mancini signed the Agreement in August 1996, he was not thinking about the payment terms in the Hospital Payment Arrangement [Tr. at 99].

4. The Agreement provided that the parties would negotiate a new reimbursement schedule based on a *per diem* arrangement. That next negotiation was to take place in September 1996 [Tr. at 91]. Because he believed the stop loss provisions would be eliminated during these negotiations, Mancini signed the August 1996 Agreement knowing that Humana would not honor the stop loss claims that exceeded government allowables. However, the *per diem* negotiations never took place. The inpatient stop loss terms were never modified by the parties at any time during the term of the Agreement [Tr. at 88-92, 94]. Those terms remained in place until the contract was terminated [Tr. at 88].

5. The reason that Humana did not go forward with the *per diem* arrangement was because Humana realized that if it went to the *per diem* arrangement it would become clear to the providers, such as Baptist, that the providers would not be paid

26

more than government allowables and if Humana did that, providers would not be willing to sign such an agreement [Tr. at 92].

6.  This court's November 7, 2002, Memorandum and Opinion opined that as to Baptist's awareness of Humana's intention to not honor the stop loss, "it appears any reasonable person would have been put on notice in August 1996 ...."  The court finds that the facts now known to it reveal that the cover letter of August 8, 1996, was not intended to modify or explain the payment terms as to the Agreement just signed, but related to the physicians' payment terms and not the stop loss issue.

7.  In September 1996, the parties did modify the Physician Payment Arrangement portion of the Agreement, by executing a written amendment that was attached as Exhibit B to the Agreement [Tr. at 86].  Prior to its termination, other amendments, addendums, or modifications to the Agreement were reduced to writing and signed by both parties [Tr. at 88-91; Ex. 1].  However, none of those amendments or changes had any affect on the stop loss hospital reimbursement terms for inpatient claims [Tr. at 86-90].

8.  At the time the Agreement was executed, Baptist did not have the capability to adequately monitor payor compliance with negotiated contract terms [Tr. at 102].  The clerical staff receiving and processing payments were essentially data entry personnel with no knowledge of specific contract terms or payment formulas [Tr. at 27-30].  Baptist obtained the PCMS software to improve their capability to track payments,

27

underpayments and payment variances. Baptist was in the forefront of the hospital industry in doing so [Tr. at 140]. Additionally, Baptist hired Hodge as a Contract Analyst for the specific purpose of identifying payment variances and underpayments by third party payors [Tr. at 101, 153]. At the time Hodge was hired, Baptist had no process for pursuing underpayments and very few contracts were loaded into PCMS [Tr. at 102]. The Humana contract was finally loaded into PCMS in November 1998 [Tr. at 123, 143].

9. In the early months of 1999, Hodge determined that Humana was not paying the stop loss claims in full according to the terms of the Agreement [Tr. at 149]. She attempted to get the stop loss claims reprocessed by Humana apparently from as early as February 1999 [Tr. at 125-130, 143-146, Exs. 70-75]. On July 22, 1999, Hodge wrote a letter to Humana's claims administrator, PGBA, and demanded payment of the difference owed on the stop loss claims [Tr. at 131]. Hodge then spoke with Humana's Montanez, who advised Hodge that Humana refused to pay the full amount of the stop loss claims on the grounds that the policies and procedures applicable to TRICARE were part of the Agreement and that those policies and procedures did not allow Humana to pay more than the CHAMPUS DRG payment that had already been made on the claims [Tr. at 132-133, 149, 156].

10. Plaintiffs never communicated any intent on their part to accept Humana's position, never agreed to drop the claim for payment in accordance with the stop loss terms, and never told Humana that they did not intend to pursue the stop loss issue.

11.  On February, 5, 2001, because Baptist refused to accept Humana's interpretation of the stop loss and insisted on being paid the full amount due under the Agreement, Humana sent a letter notifying Baptist that pursuant to the 90-day termination provision in the Agreement, it was terminating the Agreement effective May 6, 2001.  Termination of the Agreement did not result because of any misrepresentation by Baptist [Tr. at 94].  On December 7, 2001, Baptist initiated this action to recover the amounts claimed pursuant to the stop loss provisions of the Agreement [ECF # 1].

12.  During the term of the Agreement, *i.e.*, from July 1, 1996, through May 6, 2001, a total of 85 inpatient claims for care and treatment provided to TRICARE members and beneficiaries by Baptist reached the stop loss thresholds set forth in the Agreement [Tr. at 13-14, Ex. 81, Stipulations Appx. 1].  For each claim that triggered a stop loss provision, Humana unilaterally capped the reimbursement amount at 100% of the CHAMPUS DRG rate [Tr. at 169, 178].  For those 85 stop loss claims, Humana should have paid Baptist a total of $2,595,294.94.  Instead, Humana paid Baptist a total of $1,317,422.05.  As a result, the parties have stipulated that Humana underpaid Baptist $1,277,872.89 on the stop loss claims [Tr. at 14-15, Ex. 81, Stipulations Appx. 1].

13.  During the term of the Agreement, Baptist also submitted 45,491 claims for outpatient services to be paid in accordance with the outpatient terms in the Agreement, Exhibit A to the Agreement [Tr. at 170-172].  Humana asserts that from October 1996 through October 1999, it applied the wrong tier of the Hospital Payment Arrangement to

29

the payment of outpatient claims, resulting in an overpayment to Baptist on certain

outpatient claims [Tr. at 170, Stipulations, Appx. 2]. From July 1, 1996, through

September 30, 1996, Baptist and St. Mary's Medical Center were the only TRICARE

preferred network providers in the Knoxville area, which placed Baptist under the

"Baptist Health System + 1 Additional Provider" tier of the Hospital Payment

Arrangement. From October 2, 1996 through October 31, 1999, Baptist was the

Exclusive Provider in the Knoxville area, which placed Baptist in that tier of the Hospital

Payment Arrangement. Beginning November 1, 1999, Humana notified Baptist that it

had added two other hospitals to the TRICARE network in the Knoxville area, and from

that date to the conclusion of the contract, Baptist was placed in the "Baptist Health

System + 2 Additional Providers" tier of the Hospital Payment Arrangement. Humana

did not discover that it had applied the incorrect payment tier on the outpatient claims

until the Spring/Summer of 2001, after the termination of the Agreement [Tr. at 177].

The parties stipulated the amounts Humana paid on those outpatient claims [Tr. at 170-

171, Stipulations, Appx. 2, Ex. 83].


14. Because of the manner in which outpatient claims are paid, not all of the

dollars reflected as being overpaid in the Stipulations would in fact be owed back to

Humana. Instead, a portion of that total amount would be owed to patients because of

the various patient cost shares and co-insurance issues [Tr. at 61, 177-178, 181].

However, Humana, not Baptist, is in possession of the information necessary to

calculate the patient cost share and co-insurance [Tr. at 60, 177]. Because Humana

did not offer those calculations into evidence at trial, the court is unable to make a

reasonable determination of the actual amount, if any, due Humana on its counterclaim.

15.   Patient cost share does not affect the calculation of money due Baptist for the underpaid stop loss claims, as each of those claims was paid at 100% of DRG and federal regulation caps the patient's cost share liability at the DRG rate ("Under no circumstances can the cost-share exceed the DRG-based amount" [Tr. at 61; Ex. 2, TRICARE Reimbursement Manual 6010.53-M, Ch. 2, Sec. 1, Cost Share and Deductibles, p. 11, § I.C.3.d.  Cost Shares: DRG-Based Payment System]).  Therefore, the patient has already paid the maximum cost share allowed on the stop loss claims.

16.   Humana submitted evidence pertaining to Capital and Direct Medical Education Reimbursement ("Capital Reimbursements") that Baptist received not only during the term of the Agreement, but also before and after the effective period of the Agreement [Tr.  at 54, 181, Ex. 54].  Capital Reimbursements were not paid pursuant to the terms of the Agreement or as part of the process for the payment of claims submitted by Baptist [Tr.  at 182].  There is no mention of Capital Reimbursements anywhere in the Agreement  [Tr.  at 31, 181].  Capital Reimbursements are payments to institutional providers required by federal regulation regardless of whether the providers are network providers who have entered into an Agreement with Humana [Tr. at 54, 181, Ex. 54].

31

## CONCLUSIONS OF LAW

1.  Humana breached its contract with Baptist proximately resulting in damages to Baptist totaling $1,277,872.90.


2.  The evidence did not reveal a meeting of the minds or an exchange of consideration necessary to support defendant's claim of modification.  "Under Tennessee contract law, 'modification of an existing contract cannot be accomplished by the unilateral action of one of the parties.  There must be the same mutuality of assent and meeting of minds as required to make a contract.'" *Rosen v. Tennessee Com'r of Finance and Admin.*, 204 F.Supp. 2d 1048, 1058 (M.D. Tenn. 2001) (quoting *Balderacchi v. Ruth*, 36 Tenn. App. 421, 256 S.W.2d 390, 391 (1952)).  As established by *Strickland v.  City of Lawrenceburg*, 611 S.W.2d 832, 837 (Tenn.  App.  1980) (citing *Boyd v.  McCarty*, 222 S.W.2d 528, 530 (1920)) and *Hayes v.  Lewis*, 12 Tenn.  App. 627, 636-37 (1930), in Tennessee, consideration is necessary for a valid modification.


3.  Humana has not shown that plaintiffs intentionally and knowingly waived their rights to receive payments pursuant to the stop loss provisions or that plaintiffs' conduct manifested any such intent.  In Tennessee, "[a] waiver is an intentional relinquishment of a known right."  *Gitter v. Tennessee Farmers Mut. Ins. Co.*, 450 S.W.2d 780, 784 (Tenn. Ct. App. 1969) (citing *Baird v. Fidelity-Phenix Fire Ins. Co.*, 162 S.W.2d 384 (Tenn. 1942)).  "Our courts have held that there must be clear, unequivocal and decisive acts of the party or an act which shows determination not to have the benefit intended in order to constitute a waiver."  *Id.* (quoting *Webb v. Board of Trustees of*

32

*Webb School*, 38 Tenn. App. 173, 271 S.W.2d 6 (1954)).  Because it is necessary that waiver be intentional and voluntary, "when an individual does not know of his rights or when he fails to fully understand them, there can be no effective waiver of those rights." *Faught v. Estate of Faught*, 730 S.W.2d 323, 326 (Tenn. 1987); accord *Reed v. Washington Co. Bd. of Educ.*, 756 S.W.2d 250, 255 (Tenn. 1988); *Elizabethton Housing and Dev. Agency, Inc. v. Price*, 844 S.W.2d 614, 618 (Tenn. Ct. App. 1992) ("To waive a requirement, the waiving party must know all the relevant facts and intend to waive the requirement.").  "Finally, Tennessee law requires either consideration or an element of estoppel for a contractual waiver."  *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (citing *Boker v. Holder*, 722 S.W.2d 676, 680 (Tenn. Ct. App. 1986)).

4.  Equitable estoppel is not appropriate here, as there is no evidence that Baptist ever misrepresented any facts upon which Humana claimed to rely.  Further, the parties were on equal terms with one another and any reliance by Humana would not have been justified.  Indeed, the facts were more readily ascertainable by Humana than by Baptist, as defendant knew it was not honoring the Agreement long before plaintiffs discovered that fact.  When Baptist raised the issue, plaintiffs never represented that they relinquished their rights nor did Baptist purposefully act in a way calculated to convey to Humana that plaintiffs no longer expected to be paid in full under the stop loss.

5.  Baptist did not fail to take reasonable steps to mitigate damages upon learning of the breach.  Also, a finding of laches against plaintiffs is inappropriate.

33

Plaintiffs requested reprocessing of the claims at issue upon confirming defendant's failure to pay according to the terms of the Agreement. Plaintiffs also wrote letters and made calls to Humana's staff seeking payment. The lawsuit was filed when Baptist felt it had exhausted all options of receiving payment.

6.  Humana re-filed its counterclaim within the allowable period after the reversal of this case by the Court of Appeals. Accordingly, the court finds that it is proper. At the same time, Humana failed to present sufficient evidence at trial to allow the court to award it the amount requested in its counterclaim. In Tennessee, as in most states, the burden of proving damages is on the claimant and Humana was required to present sufficient evidence of record to permit the court to draw reasonable inferences and make a fair and reasonable assessment of the amount of damages. *Grantham and Mann, Inc. v. American Safety Prod., Inc.,* 831 F.2d 596, 601 (Sixth Circuit 1987). It was incumbent upon Humana to establish by a preponderance of the evidence not only that it was entitled to recover on its counterclaim, but also the amount of the damages sought by the counterclaim. Humana failed to present sufficient evidence in this regard for the court to make a fair and reasonable assessment of the amount of damages. The parties did enter into a stipulation as to Humana Military's Outpatient Claim Detail showing the overpayment in the total amount of $237,924.89 [Stipulations, Appx. 2, Ex. 81], but pursuant to the stipulations, "Baptist does not otherwise waive any defense as to liability or any claim of offset with respect to this counterclaim by Humana" [Tr. Ex. 81]. Humana's own witnesses testified that not all of the amounts reflected as being overpaid to Baptist as set forth in appendix 2 to the stipulations would be owed to

Humana.  A portion of that amount would be due to the patients on whose behalf the claims were paid because of the various patient cost share and co-insurance issues [Tr. at 61, 177-178, 181].  Humana failed to present evidence at trial of the amount owed to Humana and what portion was owed to the patients.  Consequently, the court cannot make a fair and reasonable assessment of the amount of the damages claimed by Humana or the amount of any offset to which Humana would be entitled.  Simply stated, Humana failed to establish by a preponderance of the evidence the amount of its counterclaim or the amount it would be entitled as an offset.

7.  Since the court has found that Humana has failed to present sufficient evidence to substantiate its counterclaim or its affirmative defense of offset, it is not necessary for this court to find that Humana acted in bad faith and should be prohibited by the equitable doctrine of unclean hands to barr Humana's recovery under its counterclaim or its claim for an offset.  The court notes, however, that Humana participated in sharp and deceptive business practices in its relationship with Baptist. The court finds that Humana, by its representative, entered into the agreement with Baptist knowing full well that it would not honor the stop loss claims that exceeded government allowables contained in the agreement.  Humana entered into the agreement because it believed the stop loss provisions would be eliminated during *per diem* negotiations which never took place.  Such negotiations did not take place because Humana realized that it would expose its true position that providers of health services to military personnel would never be paid more than government allowables, and medical providers would not enter into agreements with Humana if they fully

35

understood Humana's position.  Humana was caught in its own webb of deception.

8.  The monies paid to Baptist pursuant to Capital Reimbursements are totally irrelevant to the Agreement at issue, would have been paid with or without an agreement between the parties, and were not paid pursuant to the Agreement.

9.  Given the particular circumstances of this case, an award of prejudgment interest is entirely appropriate, since Baptist has remained without the use of the money Humana owed under the stop loss, and Humana could have entirely avoided the dispute that arose over the stop loss had it simply disclosed to Baptist prior to signing the Agreement that it had no intention of paying more than CHAMPUS DRG on those claims.  Had that occurred, Baptist could have chosen whether to enter into the Agreement at the lesser rate.  An award of prejudgment interest in a diversity case is also governed by state law. *Underground Pipe and Valve, Inc. v. SiteWorks Construction Company,* 191 F. 3rd 454, 1999 WL 777519 (Sixth Circuit 1999); see *Diggs v. Pepsi-Cola Metro. Bottling Co.,* 861 F. 2nd 914, 924 (Sixth Circuit 1988); *American Anodco, Inc. v. Reynolds Metal Co.,* 743 F. 2nd 417, 425 (Sixth Circuit 1984)).  Tennessee does allow prejudgment interest, as stipulated in § 47-14-123, T.C.A., which states that prejudgment interest may be awarded by courts or juries in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum.

10.  It is the conclusion of the court that an interest rate of ten percent (simple) is

36

entirely appropriate in this case. The prejudgment interest is awarded from the date

that payment was actually posted on each inpatient claim. Those dates have been

stipulated by the parties under the column, "Baptist Posting of Receipt" in the

spreadsheet made Appendix 1 to the parties' stipulations [Stipulations, Appx. 1, Ex. 81].

Prejudgment interest is appropriate on each claim comprising the total stipulated

underpayment of $1,277,872.90 at the simple interest rate of ten percent (10%) per

annum accruing from the stipulated posting date on the stop loss claims through

December 31, 2005, in the total amount of $731,488.65, amounting to a total lump sum

award in Baptist's favor of $2,009,361.40.


**ORDER TO FOLLOW.**

**ENTER:**


**_____s/Thomas W.  Phillips_____**
**UNITED STATES DISTRICT JUDGE**